CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
2/7/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| LINDA W., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-cv-00721 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MICHELLE KING, | ) | By:    Hon. Thomas T. Cullen |
| Commissioner of Social Security | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Linda W. ("Linda") filed suit in this court seeking review of the Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434.[1] Linda suffers from various disorders, including fibromyalgia, attention deficit disorder ("ADD"), major depressive disorder ("MDD"), osteoarthritis of the hip and carpometacarpal joints, and a visual impairment. On review of her application for DIB, the Commissioner (through an administrative law judge ("ALJ")) decided that, despite her limitations, Linda could still perform a range of medium work with additional modifications. Linda challenges that decision and moves for summary judgment against the Commissioner or, alternatively, for her case to be remanded for further administrative proceedings. After a thorough review

---

[1] Michelle King became the Acting Commissioner of Social Security on January 20, 2025. Under Rule 25(d) of the Federal Rules of Civil Procedure, Michelle King is substituted for Martin O'Malley as the defendant in this suit. *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

of the record, the court is satisfied that the ALJ considered all the relevant evidence and that her decision is supported by substantial evidence. Accordingly, her decision will be affirmed.

## I.    STANDARD OF REVIEW

The Social Security Act (the "Act") authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.*, but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (per curiam) (internal quotation omitted).

But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working, (2) has a severe impairment that satisfies the Act's duration requirement, (3) has an impairment that meets or equals an impairment listed in the Act's regulations, (4) can return to past relevant work (if any) based on his residual functional capacity ("RFC"), and, if not, (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.   PROCEDURAL HISTORY AND RELEVANT EVIDENCE

Linda filed her first DIB application on December 12, 2013. (R. 17 [ECF No. 5-1].) That application was denied on March 15, 2017, and the Appeals Council denied review. (R. 17–18.) Linda did not pursue it further.

On November 12, 2020, Linda protectively filed a second application for DIB, alleging disability beginning on February 1, 2018. (*See* R. 17.) Her date last insured ("DLI")—the date on which she last met the Act's insurance requirement, which is a predicate requirement to

receiving benefits—was March 31, 2023. (R. 18.) The DLI is the date by which she must establish disability to receive benefits. *See* 20 C.F.R. §§ 404.110 & 404.132.

In her second application, Linda alleged disability because of 11 medical conditions, including fibromyalgia, an unspecified left eye problem, MDD, and ADD. (R. 249, 259.) The Commissioner denied Linda's claim initially and upon reconsideration. (R. 99–109, 112–120.) Linda requested a hearing on her claim, and on March 14, 2023, she and her attorney appeared telephonically before ALJ Michelle Wolfe for a hearing. (R. 44–73.) On March 28, 2023, the ALJ issued a written decision finding that Linda was not disabled during the relevant period and denied her claim. (R. 18–43.) The Appeals Council denied Linda's request for review (R. 1), and this appeal followed.

## A. Legal Framework

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ determines the claimant's RFC between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.,* 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is

"a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1, *2.

Second, the RFC assessment must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion," SSR 96-8p, 1996 WL 374184, at *7, and must logically explain how the ALJ weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311–12. Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, and if the written decision built an "accurate and logical bridge from the evidence to his [or her] conclusion[s]." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017) (cleaned up); *Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## B. Treatment Records

Linda was diagnosed with a number of mental health impairments, including depression, anxiety, and ADD. She began receiving psychiatric care from Dr. Richard Leggett in 2014, and generally saw him every 2 months until he closed his practice in April 2021. (R.

882–918, 964–65.) During his course of treatment with Linda, Dr. Leggett prescribed a number of medications, including Klonopin, Wellbutrin, and Vyvanse which Linda generally reported were helping. (R. 889, 918.) During her appointments, she was often anxious and dysphoric at times but had no suicidal ideation. (R. 886, 891, 893, 895, 905, 912, 914, 918.) Dr. Leggett also observed, at times, that she had impaired judgment regarding time management, limited or poor insight, and variable memory. (R. 893, 895, 905, 908, 914.) At other times, he observed that her judgment was appropriate, her memory was functional, and her insight was fairly good. (R. 897, 899, 901, 903.)

Linda was also diagnosed with fibromyalgia in 2009, for which she received treatment from her primary care doctor, Wayne Brackenrich. (R. 492.) At an appointment on February 2, 2017—prior to Linda's disability onset date of February 2018—Dr. Brackenrich noted that her fibromyalgia was under control with the prescribed medication, Soma, except that she still experienced paid with excessive activity. (R. 632.) He also noted that her depression and anxiety were stable on her current medications. (*Id.*)

At her next appointment on July 7, 2017, Dr. Brackenrich observed that Linda's fibromyalgia "seems stable," she was "[s]taying as active as [she] can stand with pain," and she was "[t]aking meds which help a lot and allow her to function and do daily activities." (R. 627.) Because of the high risk of an accidental overdose from Linda's medications, which included Soma, Klonopin, and Tramadol, Dr. Brackenrich recommended that she slowly wean off the Soma. (*Id.*) Linda agreed to consider doing so in the future. (*Id.*). Finally, he recommended that she schedule a follow-up psychiatry appointment. (*Id.*).

Dr. Brackenrich's notes from a routine office visit on January 11, 2018, do not reference her fibromyalgia, but he noted that joint pain (arthralgia) in her hands had recently worsened. (R. 617.) Specifically, he noted that the "change in weather" caused Linda to experience "a little more stiffness and pain" in her "hands and joints." (*Id.*) But Linda did not have any joint swelling at the time, and he did not change her medication regimen. (*Id.*) At an appointment with Dr. Leggett the previous week, Linda reported that her depression had worsened due to marital stress. (R. 912.) Consequently, Dr. Leggett adjusted her medications. (R. 913.)

On July 12, 2018, after her alleged disability onset date, Linda saw Dr. Brackenrich again, this time for a chronic pain management visit. (R. 599.) At this visit, treatment records show that Linda was experiencing "total body pain" as a result of her fibromyalgia. (R. 601.) When on medication, she rated her pain as 2 on the 10-point pain scale, but without medication, it was a 10 out of 10. (*Id.*) Even on medication, she occasionally experienced exacerbated pain. (*Id.*) She also reported that her activities were limited by her pain, and Dr. Brackenrich noted that she was experiencing tenderness of major large muscles. (R. 601, 603.) He did not change her medications or treatments but advised her to work on weaning off the Soma and Klonopin. (R. 603.) He also noted that her mood and affect at the appointment were normal. (*Id.*) By September 2018, Linda had stopped taking Soma. (R. 596.)

On November 28, 2018, at a follow-up appointment after a serious influenza infection, Dr. Brackenrich noted that Linda was depressed, nervous, and anxious. (R. 562.) He recommended that she speak to her psychiatrist about stopping her Adderall and Wellbutrin

prescriptions. (*Id.*) One week later, at a routine OB/GYN appointment, she denied having symptoms of depression or anxiety. (R. 559.)

Linda next saw Dr. Brackenrich for a chronic pain management visit on January 11, 2019. (R. 549.) She reported that she was experiencing muscle and joint pain all over and bilateral tenderness of muscle trigger points, but that she was meeting her functional goals. (R. 550–51.) She also reported having depression and anxiety. (R. 551.)

At an appointment with Dr. Brackenrich on July 12, 2019, she again reported generalized pain, which she experienced at a level of 1 out of 10 when on medication and 4 out of 10 when off medication. (R. 537–38.) Her pain was exacerbated by changes in the weather. (R. 538.) She did not report experiencing depression or anxiety at that time. (*Id.*)

The treatment record from Linda's next chronic pain management appointment with Dr. Brackenrich, on January 17, 2020, is unremarkable, noting only that her risk for opioid abuse remains low and she is taking her medications as ordered. (R. 523–24.) Similarly, the treatment record from Linda's February 4, 2020 routine gynecology appointment notes her prior diagnoses of depression, anxiety, chronic pain, and fibromyalgia (among others), but states that she "feels well" and has "no complaints." (R. 518–21.)

In February 2020, Linda began therapy counseling sessions with Beth Holt Wright, a licensed clinical social worker. (R. 951.) The details in Ms. Wrights treatment records for Linda are sparse, but note Linda's stress from losing her job, a PTSD diagnosis relating to the deaths of her siblings, marital trauma, and depression. (R. 951–55, 957–58.) At a psychiatric appointment with Dr. Leggett on May 26, 2020, Linda reported "ongoing environmentally triggered depressive symptoms," "continued struggles with chronic low self-esteem," and

admitted to "some thoughts of cutting." (R. 888.) Based on treatment records, Linda's last counseling session with Ms. Wright was on March 31, 2021. (R. 961.) Thereafter, she did not receive formal counseling, but she talked regularly to her pastor. (R. 55.)

At her chronic pain management appointment on July 15, 2020, Linda again reported total body pain as a result of her fibromyalgia. (R. 502, 504.) With medications, her pain was a 3 out of 10, and without medications it was a 9 out of 10. (R. 504.) Dr. Brackenrich also performed a thumb-grind test during which Linda experienced pain bilaterally though it was worse in her right hand. (R. 505.) Based on the results of that test, Dr. Brackenrich diagnosed her with osteoarthritis in the first carpometacarpal joints in both hands. (*Id.*) He also noted that she was in psychiatric treatment for depression and anxiety, but that her mood and affect at the appointment were normal. (R. 504–05.)

On July 30, 2020, Linda presented to Dr. Scott Strelow, a vision specialist, with a corneal ulcer in her left eye that diagnostic testing revealed to be a pseudomonas infection. (R. 431.) Dr. Strelow prescribed antibiotic eye drops to treat the infection. (R. 434.) At a follow up 4 days later, the infection had improved, but the eye was still light sensitive, and Dr. Strelow instructed Linda to continue with the antibiotic drops. (R. 437, 440.) When Linda returned for another follow up on August 11, her eye was still tearing "all the time" and she experienced pain and photophobia. (R. 443.) Dr. Strelow prescribed an oral antibiotic in addition to the eye drops. (R. 444.) Treatment records from subsequent follow ups on August 17, August 31, September 8, and September 15 show that her pain and light sensitivity persisted. (R. 448, 454, 460, 466.) Additionally, her vision was impaired by scar tissue that formed on the corneal surface as a result of the ulcer. (R. 463.) By September 25, the pain and light sensitivity had

improved, but she still experienced them at times. (R. 472.) On October 2, Linda reported that her vision "seem[ed] improved" and she no longer experienced pain. (R. 478.)

At a psychiatric appointment with Dr. Leggett on September 29, 2020, Linda reported "increased mood instability with worsening of anxiety and depression despite continued use of Wellbutrin and Klonopin and ongoing therapy sessions." (R. 884.) Accordingly, Dr. Leggett added Lexapro to her medication regimen. (R. 885.) At subsequent appointments, Linda reported improved mood stability since starting Lexapro. (R. 882, 964.)

On October 22, 2020, still experiencing light sensitivity from the infection, she had a "light bumper to bumper [automobile] accident" because the sunlight momentarily blinded her. (R. 1034–35.) At a subsequent consult in December, Dr. Brackenrich diagnosed her with photophobia in both eyes, noted her photosensitivity, but signed DMV forms clearing her to drive after a short examination. (R. 1031, 1035.) He also noted that her affect and mood at the appointment were normal, and she showed good insight and judgment. (R. 1032.)

On November 30, 2020, Linda presented to Guy Dietels, O.D., who found that her vision was 20/30 in her right eye and 20/50 in her left. (R. 922.) He also noted scar tissue in her left eye. (*Id.*) On March 9, 2021, Linda presented to Olivia Schaubach, O.D., complaining of a "decrease in distance vision" in her right eye and occasionally "see[ing] things that are not there." (R. 928.) In addition to the car accident in October 2020, she had another car accident in February 2021. (*Id.*) Dr. Schaubach diagnosed her with a number of visual impairments, including cataracts and "other corneal scars and opacities," and gave her a prescription for glasses. (R. 932–333.)

At her annual gynecological exam on June 16, 2021, Linda again reported no concerns or symptoms. (R. 1015–19.) But at her pain-management appointment with Dr. Breckenrich the following week, she reported pain all over, especially in her spine. (R. 1012.) With medication, her pain was a 2 out of 10, and without medication it was a 9 out of 10. (*Id.*) Dr. Brackenrich also noted tenderness in the trigger points of her muscles and the diagnosis of osteoarthritis in her carpometacarpal joints. (R. 1014.) Nonetheless, she was meeting her functional goals, her depression and anxiety were controlled with medications and psychiatric treatment, and she presented with a normal mood and affect. (R. 1013–14.) A consultative x-ray of Linda's right hand, taken on August 30, 2021, confirmed Dr. Brackenrich's diagnosis of osteoarthritis. (R. 978.) At an appointment on December 28, 2021, Dr. Brackenrich adjusted Linda's anxiety medication, taking her off Klonopin and prescribing Buspar instead. (R. 1113–14.)

On April 26, 2022, Linda presented to Donald Scothorn, O.D., for a consultative eye exam, reporting decreased, fuzzy vision in both eyes. (R. 1050.) He gave her a new glasses prescription, but concluded that her vision did not meet the requirements for disability. (R. 1054.)

Linda's next chronic pain management appointment, on June 27, 2022, showed increased pain, which was now at a level of 8 out of 10, even on medications. (R. 1087.) Additionally, Dr. Brackenrich noted tenderness throughout Linda's midmuscles. (R. 1088.) But Linda was still meeting her functional goals, and Dr. Brackenrich did not change her medication regimen. (R. 1087–88.) He also noted that her depression and anxiety remained

under control with medication and that her mood and affect at the appointment were normal. (*Id.*)

The treatment records from Linda's next appointment, on November 15, 2022, are unremarkable. (R. 1065.) Dr. Brackenrich again filled out her DMV forms, clearing her to continue driving, and noted nothing of significance. (*Id.*) But when she saw Dr. Brackenrich on January 17, 2023, her symptoms had worsened. (R. 1143.) She was experiencing heightened anxiety due to family stress and thought she might need a Xanax prescription for her occasional panic attacks. (*Id.*) She also had right hip pain that had been getting worse for months. (*Id.*) It hurt to sleep on the right side and walk, especially up inclines or stairs, and she experienced stiffness most days. (*Id.*) Dr. Brackenrich took an x-ray of the hip, which showed moderate joint narrowing, diagnosed her with osteoarthritis of the right hip, and prescribed Mobic. (*Id.*)

## C. Opinion Evidence

On initial consideration of Linda's application for DIB on September 13, 2021, Linda presented to Dr. Roger DeLapp for a psychological consultative exam. (R. 986.) He diagnosed Linda with MDD and ADD and opined that Linda "could not currently be in regular attendance at work or work on a consistent basis and special supervision would be unlikely to help this. She could not complete a normal workday or work week without interruptions from her anxiety and depression. She would have difficulty interacting with supervisors, coworkers, and the public and could not manage the competitive stress of the workplace." (R. 984.)

On September 19, 2021, Linda also presented to Benita Bocanegra, NP, who conducted an examination and RFC assessment. (R. 987–93.) Ms. Bocanegra opined that

Linda could lift/carry up to 10 pounds occasionally, sit for about 8 hours, and stand/walk for about 2 hours. (R. 992.) She noted that the limitations were due to vision changes and balance concerns. (*Id.*) She also thought Linda could reach, handle, feel, grasp, bend, stoop, kneel, and squat frequently. (R. 993.)

On reconsideration of Linda's application for DIB on January 27, 2022, Dr. Joseph Leizer performed an RFC assessment relating to Linda's mental health impairments. (R. 116–17.) He found no limitation on Linda's ability to "adapt or manage [her]self," mild limitations in her ability to "understand, remember, or apply information," and moderate limitations on her ability to "interact with others" and "concentrate, persist, or maintain pace." (R. 116.) He noted that her symptoms were managed with counseling and medication "with no history of inpatient treatment," and that she had a "[d]ramatic presentation . . . with vague psychotic complaints she confirms never mentioning to any of her treating providers." (*Id.*)

On May 12, 2022, Dr. William Rutherford reviewed Linda's records and performed an RFC assessment relating to her physical and visual impairments. (*See* R. 114–15.) His examination "showed no spine or joint abnormalities and [Linda] demonstrated no difficulties navigating without assistive device or difficulty." (R. 115.) He opined that those "[p]hysical findings do not support significant physical or visual limitations." (*Id.*)

Finally, on February 20, 2023, Dr. Brackenrich submitted a medical source statement in support of Linda's DIB application. (R. 1146–47.) He opined that, in an 8-hour workday, Linda could: (1) occasionally reach, manipulate small objects, and grasp, hold, and turn objects; (2) frequently lift and carry but only less than 10 pounds; (3) stand and walk for about 2 hours; and (4) sit for about 4 hours. (R. 1146.) He also opined that she would need to take 2 to 3 30-

minute breaks throughout the day, would be absent from work or have to leave work early more than 3 times per month, and would experience symptoms severe enough to interfere with her work more than 30% of the workday. (*Id.*)

### D. Relevant Testimony

At the March 14, 2023 hearing before the ALJ, Linda testified about her medical history, symptoms, and limitations. Linda testified that her fibromyalgia and osteoarthritis "cause[] a lot of physical pain and migraines" that have worsened in the two years preceding the hearing. (R. 52.) The osteoarthritis in her hands was particularly painful when she typed on a computer keyboard for longer than 30 minutes at a time. (R. 56.) Further, the osteoarthritis caused weakness in her dominant right hand, which interfered with her ability to grasp objects. (R. 57.) She experienced "automatic pain" whenever she tried to pick anything up. (*Id.*) In addition, the osteoarthritis pain in her hip was "pretty much constant now," and she experienced it every day. (R. 58.) The pain made it difficult to climb stairs. (R. 59.) She estimated that she would have to get up and move due to the pain and stiffness in her hip about every hour if she were sitting in an office chair, and she would not be able to stand continuously for long periods of time. (R. 63.) Regarding her fibromyalgia, Linda testified that she experienced a constant throbbing pain in her neck, shoulders, and thighs. (R. 60.)

Linda also testified that she got migraines "at least once a week and they last sometimes for two days." (R. 59.) These migraines were exacerbated by stress. (R. 60.) She was prescribed Imitrex, a migraine medication, and received 9 Imitrex pills each month, but she usually ran out. (R. 61.) On days when she had migraines, she was unable to carry on with her daily routine and activities. (*Id.*)

Regarding her vision, Linda testified that she had a scar across her cornea and "everything is a blur," permanently impairing her ability to read and negatively affecting her distance perception. (R. 62.) She also had cataracts that would not be improved with surgery. (*Id.*)

Further, Linda testified that she had trouble focusing because her mind would "just wander[]," and she also experienced weekly panic attacks. (R. 65.) She also felt like "[she] can't every get anything accomplished because [she] can't ever get [her]self together." (R. 66.) She was "very withdrawn" and hardly went "anywhere . . . except for to [her] mother's." (*Id.*)

Linda also testified that she put off seeing specialists and obtaining further diagnostic testing because of financial limitations and the expense of such further care. (R. 54.)

### E. The ALJ's Opinion

In a thorough written opinion, the ALJ found that Linda was insured through March 31, 2023. (R. 18.) Through her DLI, the ALJ determined that Linda suffered from MDD, ADD, PTSD, anxiety, fibromyalgia, chronic pain syndrome, osteoporosis, and osteoarthritis of the hip, all of which qualified as "severe impairments" under 20 C.F.R. § 404.1520(c). (R. 20.) In addition, Linda suffered from numerous non-severe conditions, including arthralgia of the hands, osteoarthritis of the first carpometacarpal joints, migraines, corneal/pseudomonas ulcer in the left eye, neurotrophic cornea and central corneal opacity of the left eye, and cataracts. (*Id.*) The ALJ concluded that Linda's impairments—either alone or combined—did not meet or medically equal any of the listed impairments in the applicable regulations. (R. 21); *see* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. After considering the entire record, the ALJ found that Linda had the RFC

> to perform medium work as defined in 20 CFR 404.1567(c)
> except can do simple, routine tasks, but no complex tasks, in low
> stress work environment, defined as occasional decision making
> and occasional changes in work setting, with frequent
> interactions with coworkers, supervisors and occasional
> interaction with the public; frequent stoop, crawl, kneel, crouch,
> frequent climb ramps and stairs, but occasional climb ladders,
> ropes, or scaffolds; and limited to frequent vibrations and
> hazards, including moving machinery and unprotected heights.
> However, as of January 1, 2023, the claimant is further limited to
> occasional crouch, occasional climb of stairs and never on
> ladders[,] ropes or scaffolds.

(R. 24–25 [*sic* throughout].) As a result, the ALJ found that a significant number of jobs exist

in the national economy that Linda can perform (such as cleaner, counter supply worker, and

snack food mixer), and that Linda was "not disabled" within the meaning of the regulations

from the alleged disability onset date—February 1, 2018—through her DLI. (R. 37–38.)

### III.    ANALYSIS

Linda makes 3 arguments in support of reversal or remand: (1) the ALJ improperly

analyzed the medical opinion evidence; (2) the ALJ did not properly consider Linda's

symptoms and activities of daily living; and (3) the ALJ erroneously concluded that Linda's

vision and hand impairments were non-severe. (Pl.'s Br. at 11 [ECF No. 10].) The court

considers each argument in turn.

### A. Medical Opinion Evidence

First, Linda challenges the ALJ's analysis of the medical opinion evidence, which Linda

characterizes as improper "cherry-pick[ing]." (*Id.* at 14.) But a review of the ALJ's opinion

evidences no such thing. The question of how much weight to give a medical source opinion

is generally reserved for the ALJ, as district courts may not "reweigh conflicting evidence,

make credibility determinations, or substitute [their] judgment" for that of agency officials.

*Hancock*, 667 F.3d at 472 (internal quotation omitted). So long as the ALJ applied the correct legal standard and built an "accurate and logical bridge from the evidence to [her] conclusion[s]," district courts must uphold the agency's decision. *See Brown*, 873 F.3d at 269 (cleaned up).

When considering medical evidence, ALJs are required to consider five factors, as laid out in 20 C.F.R. § 404.1520c(c). Those factors are supportability, consistency, relationship with the claimant, specialization, and other factors. *See* 20 C.F.R. § 404.1520c(c)(1)–(5). Of those factors, supportability and consistency are the most important in determining the persuasiveness of a medical opinion, and ALJs must explain specifically how they considered supportability and consistency in reaching their decision. § 404.1520c(b)(2). Linda argues that the ALJ did not properly apply those factors.

With respect to Dr. Brackenrich, Linda challenges the ALJ's evaluation of the opinion's supportability, contending that "the ALJ fails to mention the lengthy treatment relationship between Plaintiff and Brackenrich"—a consideration assigned by regulation to the "relationship with the claimant" factor, not supportability. *See* 20 C.F.R. § 404.1520c(c)(3).

While ALJs must specifically address supportability and consistency, they "are not required" to address the remaining factors. *Id.* § 404.1520c(b)(2). Here, the ALJ expressly addressed both supportability and consistency. Regarding supportability, she explained that "the severity of the limitations in his medical source statement are not supported by the generally normal clinical exams, the conservative level of treatment . . . and the degree of abnormality on diagnostic testing." (R. 35.) The lack of support from diagnostic testing also speaks to the opinion's consistency. (*Id.*) The ALJ therefore explained that her conclusion that

Dr. Brackenrich's opinion was unpersuasive stemmed from the disparity between the severe limitations he opined Linda faced and the fact that his treatment "consists only of prescribed pain medication." (*Id.*) In this way, the ALJ built an "accurate and logical bridge from the evidence to [her] conclusion." *Brown*, 873 F.3d at 269 (cleaned up).

The ALJ's conclusion is supported by two additional considerations. First, though Linda faults the ALJ for failing to account for her "worsening right hip pain," it is clear that the ALJ *did* take this into account, namely by further limiting Linda's RFC after January 1, 2023, to only "occasional crouch, occasional climb of stairs and never on ladders[,] ropes or scaffolds." (R. 25.) Second, Dr. Brackenrich's treatment records regularly note that Linda's medication significantly improved her pain, her overall functional status was "good," her functional status was "stable" over the preceding 6 months, and she was "meeting functional goals." (R. 504–05, 538–39, 551, 601, 603, 1012–13, 1032, 1065, 1087.) These records support the ALJ's assertion that Dr. Brackenrich's opinion is not supported by his own treatment records for Linda.

Linda also argues that the ALJ failed to consider the supportability and consistency of Ms. Bocanegra's and Dr. DeLapp's opinions by improperly discounting them as "one-time snapshots." (Pl.'s Br. at 13.) With respect to Ms. Bocanegra, the ALJ's opinion reveals that she found the opinion unpersuasive because it was "not consistent with [Ms. Bocanegra's] clinical findings on exam" and "the totality of the evidence"—in other words, she based her conclusion directly on the opinion's lack of supportability and consistency. (R. 34.) So too with Dr. DeLapp, whose opinion the ALJ found unpersuasive for the same reasons. (R. 34–35.)

- 18 -

Accordingly, the ALJ built an "accurate and logical bridge from the evidence to [her] conclusion," *Brown*, 873 F.3d at 269 (cleaned up), and her conclusions regarding the medical opinion evidence are supported by substantial evidence. *See Richardson*, 402 U.S. at 401. While Linda may disagree with the ALJ's ultimate conclusion, this court cannot reweigh the evidence before the ALJ so long as the ALJ "considered all the relevant evidence under the correct legal standards," *Cynthia J. v. Kijakazi*, No. 4:21-cv-00001, 2022 WL 263405, at *3 (W.D. Va. Jan. 27, 2022), which the ALJ did here.

## B. Linda's Subjective Complaints

Next, Linda argues that the ALJ "improperly discounted the detrimental impact [her] symptoms had on her daily activities and functional capacity." (Pl.'s Br. at 15.) But because the ALJ's findings are supported by substantial evidence, the court cannot disturb the agency's determination. If the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," the court must defer to the ALJ, regardless of how it may have viewed the evidence had it been before the court in the first instance. *See Richardson*, 402 U.S. at 401 (internal quotation omitted).

The ALJ's thorough opinion points out that Linda reported to Dr. Brackenrich at her semi-annual appointments that her medication managed her pain levels, she could complete daily activities, her condition was stable, and her overall function status was good. (R. 26–29.) The ALJ also noted that Linda worked part-time until the start of the COVID-19 pandemic. (R. 35.) The evidence the ALJ relies on is sufficient to meet the substantial evidence standard. While there is additional, contradictory evidence in the record, it is no more than "conflicting evidence [that] allows reasonable minds to differ as to whether a claimant is disabled." *Johnson*,

434 F.3d at 658 (internal quotation omitted). Though the ALJ gave that conflicting evidence less weight than Linda believes it deserves, the ALJ discussed the evidence Linda seeks to rely on, so this is not a case in which the ALJ failed to consider all of the evidence. (*See* R. 25–26.) Ultimately, Linda (reasonably) asserts that her statements regarding daily activities and symptoms warrant greater limitations on her RFC, while the ALJ (also reasonably) explained that greater limitations are not supported by the treatment records. Where such reasonable disagreement as to the relative weight of inconsistent evidence exists, the court must defer to the ALJ's factual findings. *See Johnson*, 434 F.3d 658; *Hancock*, 667 F.3d at 472.

### C. Linda's Hand and Vision Impairments

Finally, Linda challenges the ALJ's determination that her vision and hand impairments were non-severe. But this argument likewise amounts to no more than a disagreement about how much weight to accord to conflicting pieces of evidence. Because the court cannot substitute its judgment for the ALJ's by reweighing the evidence, this argument likewise fails. *See Hancock*, 667 F.3d at 472.

It is true that the record demonstrates that Linda suffered from medically determinable hand and vision impairments—and the ALJ recognized as much. (*See* R. 20.) But the ALJ based her conclusion that the hand impairment is non-severe on the fact that the August 2021 consultative x-rays of Linda's hands showed no "indication of inflammatory arthritis," and a consultative physical exam one month later showed normal range of motion and strength in all extremities. (R. 28–29.) And the ALJ concluded that the vision impairment was non-severe because Dr. Brackenrich cleared her to drive. (R. 28.) Specifically, Dr. Brackenrich noted that he saw "no issues to prevent her from doing so." (R. 1032.) That suffices under the substantial

evidence standard, and the court will not second guess the ALJ's factual findings as to the extent of these impairments. *See Hancock*, 667 F.3d at 472.

## IV.    CONCLUSION

The court has reviewed the remainder of the ALJ's decision and supporting evidence and is satisfied that the decision is supported by substantial evidence. For this and the foregoing reasons, Linda's motion for summary judgment will be denied, and the Commissioner's decision will be affirmed.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 7th day of February, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE